# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
September 15, 2005 Session

## GARY JOHN WHITE, JR., ET AL. v. JERRY KELVIN FARLEY

**Appeal from the Probate and Family Court for Cumberland County**
**No. 14611      Steven C. Douglas, Judge**

------

### No. E2005-00396-COA-R3-PT - FILED OCTOBER 14, 2005

------

This appeal involves the parental rights of a father to his eight-year-old daughter. When the child was approximately 17 months old, the mother moved with the child to Ohio. The father did not know their whereabouts for many months. In the parties' divorce, the mother was awarded custody of the child and the father was awarded specific visitation privileges. The father failed to exercise his visitation rights and failed to visit or support the child for more than four months. The mother, who had remarried, filed a petition to terminate the father's rights on the grounds of abandonment. Father presented proof at trial of his meager earnings due to a physical impairment, limited education and the loss of his job. Father also presented proof that he had tried to contact the child by telephone but was unable to do so. The trial court declined to terminate the father's parental rights because there had not been proof by clear and convincing evidence of abandonment or that termination of the father's parental rights was in the child's best interest. After a careful review of the record and the applicable law, we agree with the trial court that the father's lack of visitation and support was not willful and that termination of the father's parental rights was not in the child's best interest. Accordingly, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Probate and Family Court Affirmed; Cause Remanded**

SHARON G. LEE, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J. and D. MICHAEL SWINEY, J., joined.

Clark Lee Shaw, Marco Island, Florida, and Steven D. Qualls, Cookeville, Tennessee, for the Appellants, Gary John White, Jr. and Doreen Klimo White.

Allison M. Barker, Crossville, Tennessee, for the Appellee, Jerry Kevin Farley.

# OPINION

## I. Background[1]

Doreen Klimo White, ("Mother") and Jerry Kelvin Farley, ("Father") are the biological parents of Kelsi Lorraine Farley who was born on August 1, 1997. In December of 1998, Mother and Father separated, and Mother left the marital residence with Kelsi and moved to Ohio. Father testified as follows regarding Mother's leaving:

> I came home from work and everything was gone, all the belongings, all the belongings of my ex-wife. My little girl was gone and all of her belongings, and I didn't know where she was or nothing. They was just gone. All they left was a picture and a little old piece of tile on the counter and that was it.

Although Mother denies that she took any of her or her child's personal belongings when she left Father, she concedes that she did not advise Father as to where she was going and states that she has no idea when he found out where she and Kelsi were.

After Mother left with their child, Father testified he contacted a private investigator to locate them and hired an attorney to file a complaint for divorce. Father learned of Mother's whereabouts only after she filed a proceeding for a restraining order against him in Ohio. A divorce hearing was held on February 26, 1999, and Father and Mother were divorced by final decree entered in September of 1999.

Although the parties' divorce decree is not part of the record on appeal, it appears from the parties' testimony that Mother was granted custody of Kelsi and Father was allowed telephone contact with his child; two weeks of visitation in October and March; and two months of visitation in June and July. In June, 2000, he filed a petition for contempt against Mother alleging that Mother denied him visitation in October of 1999, and that, although she allowed him to make up such visitation in November, he was not allowed to see his child after November, 1999.

In March of 2000, Mother married Gary White, Jr. Mr. White testified at trial that although he and Mother had known each other for years, they did not become "romantically involved" for a "good six months" after she moved to Ohio in December of 1998. However, in their petition to terminate Father's parental rights, the Appellants state that they "began to cohabitate" in January of 1999, and Mother and her husband, Gary White, Jr. had a child in December of 1999. Mother, her husband, their child and Kelsi resided together in Ohio at the time of the trial.

---

[1]Although pleadings filed in proceedings between the parties prior to the petition to terminate were referred to in the trial of this case and were introduced as exhibits at trial, none of these pleadings or other exhibits introduced at trial were included in the record on appeal. Accordingly, the facts set forth in this opinion are derived primarily from witness testimony as set forth in the transcript of the hearing on the petition to terminate held on August 18 and 19, 2004.

On January 15, 2001, Mother and Father signed an agreed order in the contempt proceeding brought by Father. Although not part of the appellate record, it appears that this order allowed Father to retain his rights of visitation as set forth in the final decree of divorce and to make up any previously disallowed visitation. The order apparently also reiterated Father's right to make telephone calls to Kelsi each week on Mondays and Thursdays between 11:00 a.m. and 12:00 p.m. It is undisputed that visitation took place as decreed by this order throughout 2001 and the first half of 2002.

In June and July of 2002, Kelsi visited with Father and his family at his home in Crossville, Tennessee. However, the Appellants allege that, after July of 2002, Father made no attempt to communicate with Kelsi other than one phone message he left on their answering machine in August of that year. Father attests that he attempted to reach his daughter by telephone on multiple occasions after July of 2002, but that his calls were blocked by the Appellants' answering machine which required that he present an access code that he did not have.

On May 16, 2003, the Appellants filed a petition to terminate Father's parental rights to Kelsi upon grounds of abandonment alleging that Father had willfully failed to both visit and support his child for a period of time greater than four months. The petition further requested that "a parental relationship be established between" Gary White, Jr. and Kelsi.

A hearing was held on the petition to terminate on August 18 and 19, 2004. The trial court determined that the petition should be denied and stated its findings of fact as follows:

> I don't believe there's a more difficult decision that I'm called upon to make sitting in this position than in the matters where we question the rights of a parent. I think the Appellate Courts and the Supreme Court acknowledge that as a very, very important right that is not to be terminated except in the most extreme cases.
>
> I think there are plenty of cases talking about it can't be willful failure to support if he doesn't have the ability to work, and I don't think there's any question in the proof or with the attorneys that this man has a limited physical ability to work and limited education, is effectively, functionally illiterate, and that his ability to pay child support is not good. And the fact that he has not hired a lawyer to try and modify is a problem because he obviously at one point was paying child support and he's accumulated a very large arrearage. But I do not find there's a willful failure to support here because I don't think he had the means to pay the support, and he just didn't have the means to hire a lawyer to get that modified down, based on the income that he was presented he probably wouldn't have been paying any support anyway. So I don't think that's the crucial issue here.

The difficult one is the failure to communicate with the child. There were obviously, early on, efforts by the mom to interfere with that or she wouldn't have gone to Ohio, or wherever it is she went, without telling him where they were going.

Then we come back and we're in court and we're out of court, and there are agreements and he is visiting and they're exchanging the child, as I recall, at someplace in Kentucky. Then for a while things go okay. Then all of a sudden there's nothing. And the testimony from the parents were, well, we contacted our lawyer and our lawyer contacted his lawyer and we moved, but we even kept the same phone number so if he tried to call the call would be forwarded to our home so that all he had to do was call, and for a while he was calling, and then stopped. His testimony is that there was an answering machine that says you have to have an access code or some type of password to access that. The stepfather says, huh-uh, no way, that's not right. The telephone records don't show any block.

It got to a point where Mr. Farley says, I didn't have the money to hire a lawyer. I couldn't make the phones work. They didn't communicate with me, and I just quit calling. So did he have a legitimate excuse up to a point and then the excuse isn't good anymore because he got frustrated and quit, or was it he just did everything he knew to do and there wasn't anything else for him to do?

I recall personally asking him some question, and maybe it was Mr. Qualls asking the questions, but we did talk about did you call the police in Ohio to do a welfare check, did you drive up there to talk to the police to see if you could find the child, did you attempt to contact the school. Lots of things that better educated people or people with more means might have done, but I have to look at this from his situation, he doesn't have much education, he doesn't have adequate transportation. Getting to Ohio, he might as well been trying to get to California or Canada or someplace. Based on the proof, he could hardly get from his house to town apparently.

Then we have to wonder about the best interest of the child. Well, the child is apparently being very well cared for now, according to all the testimony. She won't be any better cared for if his rights are terminated, but if his rights are terminated, she'll never know her dad and she'll never know her grandparents, and it's important that any child have the ability to know both sides of the family.

This is a very difficult decision to make, but I just don't think that the Petitioner in this situation has shown me that it's in the best interest of the child to terminate his parental rights, and I don't think that there's clear and convincing evidence that there was a willful failure to support, and I don't think there's clear and convincing evidence that he willfully stopped seeing his child. It's my finding he did not make a conscious effort to not see his child. He wanted to see his child and he just was stumped as to how to do that. He did everything he knew within his means, which were limited, and that the efforts of the mom and the step-dad apparently were sufficient to wear him out.

On January 14, 2005, the trial court incorporated these findings of fact in an order denying the Appellants' petition to terminate Father's parental rights. This appeal followed.

## II. Issues for Review

The issues we address in this appeal are restated as follows:

1) Whether the trial court erred in finding that Father did not abandon his child by willfully failing to support or visit her.

2) Whether the trial court erred in finding that termination of Father's parental rights was not in his child's best interest.

## III. Standards for Reviewing Termination Orders

A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2059-60 (2000); *Hawk v. Hawk*, 855 S.W.2d 573, 578-579 (Tenn. 1993); *Ray v. Ray*, 83 S.W.3d 726, 731 (Tenn. Ct. App. 2001). Although this right is fundamental and superior to claims of other persons and the government, it is not absolute. *State v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without interruption only as long as a parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988)(*citing Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972). However, this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute. *Id.*

Termination proceedings are governed by statute in Tennessee. Parties who have standing to seek the termination of a biological parent's parental rights must first prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1). Secondly, they must prove

that termination of the parent's rights is in the child's best interest.  Tenn. Code Ann. § 36-1-113(c)(2). Because the decision to terminate parental rights has profound consequences, courts must apply a higher standard of proof in deciding termination cases. Therefore, to justify termination of parental rights, the party seeking termination must prove by clear and convincing evidence the ground (or grounds) for termination and that termination is in the child's best interest. Tenn. Code Ann. §36-1-113(c)(1); *In re Valentine*, 79 S.W. 3d 539, 546 (Tenn. 2002).

The heightened burden of proof minimizes the risk of erroneous decisions.  *In re C.W.W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998).  Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable, *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003) *no appl. perm. filed*, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.  *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004).  It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established.  *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

Courts terminating parental rights are explicitly required to "enter an order which makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k).  These specific findings of fact and conclusions of law facilitate appellate review and promote just and speedy resolution of appeals.  When a lower court has failed to comply with Tenn. Code Ann. § 36-1-113(k), the appellate courts must remand the case with directions to prepare the required findings of fact and conclusions of law. *In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

In a non-jury case such as this one, we review the record *de novo* with a presumption of correctness as to the trial court's determination of facts, and we must honor those findings unless there is evidence which preponderates to the contrary.  Tenn. R. App. P. 13(d); *Union Carbide v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993).  When a trial court has seen and heard witnesses, especially where issues of credibility and weight of oral testimony are involved, considerable deference must be accorded to the trial court's factual findings. *Seals v. England/Corsair Upholstery Mfg. Co., Inc.*, 984 S.W.2d 912, 915 (Tenn. 1999).  Further, "[o]n an issue which hinges on the credibility of witnesses, the trial court will not be reversed unless there is found in the record clear, concrete, and convincing evidence other than the oral testimony of witnesses which contradict the trial court's findings." *Galbreath v. Harris*, 811 S.W.2d 88, 91 (Tenn. Ct. App. 1990), citing *Tennessee Valley Kaolin Corp. v. Perry*, 526 S.W.2d 488, 490 (Tenn. Ct. App. 1974).  The trial court's conclusions of law, unlike its conclusions of fact, are accorded no presumption of correctness. *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

### IV. Grounds for Terminating Father's Parental Rights: Abandonment

Tenn. Code Ann. 36-1-113(c) requires that termination of parental rights be based upon the following:

> (1) A finding by the court by clear and convincing evidence that the grounds for termination [of] parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

Tenn. Code Ann. §36-1-113(g)(1) provides that initiation of the termination of parental rights may be based upon the ground of "abandonment" as further defined at Tenn. Code Ann. §36-1-102. The latter statute provides at subsection (1)(A)(i) that, among other things, "abandonment" means the following:

> For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parental rights of the parent(s) or guardian(s) of the child who is the subject of the petition for termination of parental rights or adoption, that the parent(s) or guardian(s) either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

In *In re Kleshinski,* M2004-00986-COA-R3-CV, 2005 WL 1046796, at *18 (Tenn. Ct. App. May 4, 2005), we stated as follows regarding the requirement of willfulness in a proceeding to determine abandonment upon allegations of failure to visit and support:

> The requirement that the failure to visit or support be "willful" is both a statutory and a constitutional requirement. *See In re Swanson*, 2 S.W.3d at 188; *see also In re D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003). "The concept of 'willfulness' is at the core of the statutory definition of abandonment." *In re Muir*, 2003 WL 22794524, at *4. In the context of the statute governing termination of parental rights, the term "does not require the same standard of culpability required by the penal code ... [n]or does it require malevolence or ill will." *Id.* at *5. To be "willful," the conduct must be the product of free will rather than coercion;" a person is deemed to act "willfully" if he is a free agent, knows what he or she is doing, and intends to do what he or she is doing." *Id.*

## A. Willful failure to pay child support

First, we address the Appellants's contention that the trial court erred in finding that Father did not willfully fail to pay child support. In their brief, the Appellants assert that Father "admits to not paying child support and presents no real proof as to why."

With specific regard to the question of what constitutes willful failure to support, we have previously stated as follows:

> Failure to support a child is "willful" when a person is aware of his or her duty to support, has the capacity to provide the support, makes no attempt to provide support, and has no justifiable excuse for not providing the support.

*In re Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524 at *5 (Tenn. Ct. App. Nov. 25, 2003).

Father concedes that he had not paid child support for more than four months preceding the filing of the petition. However, he also attests that it is his intention to pay child support and that he did make regular child support payments until he lost his job in 2001. Father also testifies that his reported income for 2002 was only $3,850.00 and $39.00 for 2003, and that he is supported by his disabled parents with whom he resides. Father's testimony further indicates that he has been physically impaired as the result of a knee injury that required surgery two years prior to trial and that although he recently obtained employment in order to make child support payments, he is still in pain from that injury and his knee is "just finally getting able to where it won't pop out.". Father's testimony also indicates that his ability to find employment has been limited by his lack of education, and that while he is able to sign his name and Kelsi's name, otherwise he is unable to either read or write. In this respect, Father testified, "I've tried to learn it, but they sent me for studies and I think it was (unintelligible) different places, and they did tests on me and I just can't learn how to read and write."

With further regard to the question of whether Father's failure to support Kelsi was willful, we are compelled to note the following testimony of Appellant Gary White, Jr. under cross examination:

> Q. You made the statement, Mr. White, that you didn't think [Father] was capable of supporting [Kelsi].
>
> A. Yeah.
>
> Q. *He's not able to support this child, is he, financially?*
>
> A. *No.*
>
> Q. Should his rights be terminated because he can't?

A. Not because he can't financially support her, no.

On re-direct examination Mr. White further testified as follows:

Q. ... Ms. Warner had also asked you if you think that his rights should be terminated because he's unable to pay support and you said, "No, certainly not."

A. Not by itself.

Q. If he's able to work and make some sort of money, do you think he ought to pay child support?

A. Of course.

Q. And do you think those are grounds to terminate his parental rights?

A. I think a combination of everything.

(emphasis added).

It appears from Mr. White's testimony under re-direct examination that he agrees that *if* Father is able to work and make money he should be paying child support and that, under such circumstances, his failure to pay support constitutes grounds for termination of his parental rights. However, Mr. White never recants his admission under cross examination that Father "is unable to support his family financially."

Even aside from this apparent concession of Mr. White, the other evidence we have referenced above is sufficient to warrant the trial court's conclusion that Father was financially unable to support his child and therefore his failure to support was not willful. A parent who fails to support a child because he or she is financially unable to do so is not willfully failing to support the child . *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995). Our review of the record indicates that the evidence preponderates in favor of the trial court's conclusion that Father's failure to pay child support was not willful. It necessarily follows that we agree with the trial court that there was not clear and convincing evidence showing that Father willfully failed to support his child.

### B. Willful Failure to Visit

Next, we address the Appellants' argument that "the proof is clear and convincing that [Father] willfully and intentionally failed to ...visit his child for more than four months as set forth

in the statute." In apparent support of this argument, the Appellants observe that Father did not make phone calls or send letters to Kelsi for many months.

It is not disputed that Father did not communicate with Kelsi for at least four consecutive months preceding the filing of the petition. However, clear and convincing evidence was not presented that his failure to communicate was willful.

Father testified that although he has tried to contact his daughter by phone since July of 2002, his calls have been blocked by the Appellants' answering machine:

> I mean, I tried to call more than once, but I got through the answering machine the day of [Kelsi's] birthday; that's it. But the rest of the time I get a - - some kind of - - it's like a block. You got to have a code to get through the number.

Appellant Gary White testified that an access code can be programmed into the answering machine, but that this was not done. The Appellants assert that telephone bills were submitted to the court showing that there was no call blocking on their number, and the court acknowledged that the telephone records do not show a block on calls. However, it was not established whether the telephone billing records would indicate whether the answering machine was programmed with an access code that could block calls, if the answering machine had been so programmed. The trial court clearly reached its conclusions that Father had in fact attempted to contact Kelsi based upon its assessment of the his credibility, and we find nothing in the record that dissuades us from deferring to the trial court's assessment in that regard. As to Father's failure to contact the child by other means, the following testimony of Father under cross examination indicates his anticipation, based upon his past experience in this case, that any efforts he might have made to contact his daughter would have been futile unless he hired an attorney, which he was financially inhibited from doing:

> Q. Did you ever think of just picking up the phone and calling Steve Qualls, calling me, and saying, What's her number, I can't get in touch with her?
>
> A. I mean, I went through this.
>
> Q. No. Just answer my question. Did you ever - -
>
> A. Well, here, I'll answer your question: I didn't think of that. The only steps I know that are good for me, where I don't get in no trouble, is hire me an attorney and go through the legal steps. That's the only way I know how to issue anything with [Mother], because that's the only way I've got to. It's took four times to do this. Every time I've ever had any dealings with her over my daughter, I've had

to go through a lawyer to get anything done. So there ain't no other steps I know of to get anything done, besides that step, and that's the step I'm in right now.

The trial court determined that Father's failure to visit was not willful based upon findings that Father wanted to see his child and that, although he attempted everything within his limited means to do so, the efforts of the Appellants "were sufficient to wear him out." The evidence does not preponderate against such findings.

## V. Best Interest of Child

We next address the issue of whether the trial court erred in finding that termination of Father's parental rights was not in Kelsi's best interest.

Before parental rights may be terminated under Tenn. Code Ann. § 36-1-113 there must be a finding that termination is in the best interest of the child *and* a finding by clear and convincing evidence that grounds for termination have been established. Having determined that grounds for termination were not established by clear and convincing evidence in this case, we need not address the question of whether termination of parental rights is in the best interest of the child. Nevertheless, we will address this issue in our discretion.

Tenn. Code Ann. § 36-1-113(i) sets forth some of the factors to be considered by the court in determining whether termination of parental rights is in a child's best interest:

> (1) Whether the parent or guardian has made such an adjustment of circumstances, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
> (5) The effect of a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional

or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

In their brief, the Appellants' argument that termination of Father's rights to his child appears to consist solely of the following:

That the best interests of the child would be served by such termination is evident from the proof in this case. The child is in a well adjusted and happy home and has known no other father for over two years except her step father. That she should be uprooted by all of this as a result of the willful acts of her natural father is unjust and not in her best interests.

We find no merit in this argument. First of all, there is no evidence showing that if Father retains his parental rights that Kelsi will not remain in the Appellants' "well adjusted and happy home." Further, there is no evidence that Kelsi has been "uprooted" by any acts or omissions by Father, and, as we have indicated, the evidence does not support a finding that actions by Father of which the Appellants complain were willful actions.

The Appellants do not deny that Father loves his child and Father testified as follows in that regard:

I can only get so many jobs with my education. I can't - - that don't make me a bad father. I love my daughter with every thing. Just cause of my education don't stop me from loving my daughter.

The evidence further shows that Father has a large extended family nearby and that a positive relationship has developed between Kelsi and Father's family as a result of her visits. In this regard, Father testified that Kelsi attends church with his family when she visits and further testified as follows:

-12-

Q.   Tell me a little bit about Kelsi's family here.  Does she have cousins, aunts, uncles?

A.   Yeah.  She's got a big family.

Q.   Do her grandparents - -

A.   Yeah.  Well, on my father's side it's my - - I've got my grandpa and my step-grandma.  And my dad's got two sisters and two brothers, and everyone of them has got two sisters and two brothers, and everyone of them has got kids and grand-kids and they all come over for Kelsi's birthdays, and they come over and play all the time and they just - - you know, we've got a swing-set, sandboxes and everything out in the front yard and they come over and play.

Then on my mama's side - - we live at the end of the road and the whole road is my family that's that's on my mama's side.  And all my aunts on my mama's side, their kids and their grand-kids they come down there and play.  It's just a big family like, you know.  I mean, my grandma on my mama's side has got eight kids and then they got - - I mean, we're real close, everyone of us. I mean, all the kids play down there every day.  I mean, you can come down there today and you'll see 10 or 15, but they're all family on our road, riding four-wheelers and playing basketball and stuff like that.

We believe it is important that Kelsi continue her relationship with Father and his family. We do not agree that it is in the best interest of Kelsi that her Father's parental rights be terminated. On the contrary, our review of the record and our consideration of relevant factors under Tenn. Code Ann. §36-1-113 convinces us that it is in Kelsi's best interest that Father retain his parental rights and that Kelsi continue to have a relationship with her father.

## VI. Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed. The petition to terminate the parental rights of Jerry Kelvin Farley is dismissed and the cause is remanded for collection of costs.  Costs of this appeal are adjudged against Gary John White, Jr. and Doreen Klimo White.

<hr>

SHARON G. LEE, JUDGE

.